DA 12-0145

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2012 MT 231

IN THE MATTER OF:

D.B.,

    A Youth in Need of Care.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DN 2010-02
Honorable James A. Haynes, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

    Elizabeth Thomas, Attorney at Law, Missoula, Montana

    For Appellee:

    Steve Bullock, Montana Attorney General; Mardell Lynn Ployhar, Assistant
Attorney General, Helena, Montana

    Michael L. Hayes, Special Deputy County Attorney, Hamilton, Montana

Submitted on Briefs:  July 25, 2012
Decided:  October 22, 2012

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1     J.B. (Father) appeals an order of the Twenty-First Judicial District Court, Ravalli County, that terminated his parental rights.  We affirm.

¶2     Father raises the following issues:

¶3     *Did the District Court abuse its discretion in determining that the Department proposed an appropriate treatment plan?*

¶4     *Did the District Court abuse its discretion in determining that Father would be unlikely to change within a reasonable amount of time?*

¶5     *Did Father receive ineffective assistance of counsel?*

¶6     Father and M.S. (Mother) are the biological parents of D.B.  Mother had D.B. in 2000.  Mother primarily raised D.B.  Father had lived with D.B. for a few months when D.B. was less six months old.  Father has had few visits with D.B. since that time with the exception of weekend visitations during 2008 and 2009.  This visitation ended when Father moved to Mississippi in 2009.  Father's departure left D.B. entirely in the physical custody of Mother.

¶7     Authorities removed D.B. from Mother's custody in 2010 after Mother was arrested for partner or family member assault.  D.B. and his stepbrother had been subject to numerous domestic violence incidents before Mother's 2010 arrest.  The District Court accordingly granted the Department of Public Health and Human Services (Department) emergency protective custody.  Father stipulated at the show-cause hearing to D.B.'s status as a youth in need of care.  He further stipulated that Department should have temporary legal custody.

¶8     The Department developed a treatment plan for Father.  The treatment plan set out

numerous reasons for D.B.'s abuse and neglect. The treatment plan detailed Father's criminal history. The history included the fact that Father had violated his probation in 2009 by driving under the influence and leading officers on a high-speed chase. The treatment plan also noted Father's history of drug and alcohol abuse. The plan further identified Father's history of domestic violence. Police had been called to Father's residence on numerous occasions. Father ran up three assault charges between 2001 and 2004. The treatment plan also noted that Father possessed a "self-admitted anger problem." Finally, the plan noted that Father had demonstrated an inability to meet D.B.'s physical and emotional needs, and that D.B. did not want to live with Father.

¶9 Father stipulated to all these findings. He also stipulated to various tasks that he would need to complete. The District Court approved the treatment plan in March 2010. The court ordered that Father complete the plan by July 28, 2010.

¶10 Father complied with parts of the plan, but he continually demonstrated an issue with one problem in particular—an inability to develop a parenting relationship with D.B. The Department sought extensions to the treatment's completion date due to Father's difficulties in establishing a relationship with D.B.

¶11 The Department scheduled a supervised visit between Father and D.B. in Montana for one week in 2011. It also arranged for a parenting evaluation—a requirement of his treatment plan—during this visit. The Department purchased a plane ticket for Father and offered to pay for his hotel room in Montana. Department officials could not recall offering to pay for a hotel room for any other parent. A few days before this visit, however, Father discovered that D.B. did not want to see him. Father also disliked the fact that the proposed

3

visits would be supervised. Father eventually refused to come to Montana.

¶12 These problems had arisen in advance of Father's scheduled supervised visit. D.B. apparently feared his Father. D.B. often refused to speak to Father during weekly phone calls. D.B. showed signs of anxiety during these phone calls. D.B. had trouble with bed-wetting on days of the phone calls. D.B. also conveyed stories of Father yelling at him to child protection specialists. D.B. further told his therapist about two incidents where Father had become violent with other family members in D.B.'s presence.

¶13 The therapist noted that Father's failure to empathize with D.B. continually proved to be a significant obstacle. D.B.'s therapist explained to Father that D.B. would not feel safe with him unless Father would stop questioning the validity of D.B.'s feelings. Father insisted that D.B. was not actually afraid of Father. Father claimed that Mother's family had manipulated D.B. into lying about the violent incidents. D.B.'s therapist ultimately concluded that Father's unwillingness to empathize with D.B. made it impossible for the two to form a relationship. She also noted that D.B.'s continuing fear of Father contributed to his unresolved post-traumatic stress disorder.

¶14 Department officials similarly concluded that Father was more interested in blaming others than he was in forming a relationship with D.B. A child protection specialist noted that Father responded to D.B's fear of Father by suggesting that D.B. should be given a lie detector test. Father also accused the Department officials of failing to do their job. Father threatened to retaliate against the Department after the termination proceedings. Father went so far as to state that his attorney would be coming after money, but that Father would be coming for blood.

¶15 Father also focused more on Mother's treatment than his own. He refused to come to Montana for supervised visits when Mother had unsupervised visits. Father also claimed that he had hired a private investigator to follow Mother.

¶16 The Department ultimately determined after 20 months of poor cooperation from Father that it would seek termination of his parental rights. Father challenged the treatment plan's validity, and argued alternatively, that he should be given more time to comply with the treatment plan. The District Court terminated Father's parental rights. Father appeals.

STANDARD OF REVIEW

¶17 We review for an abuse of discretion a district court's decision to terminate parental rights. *In re D.B.*, 2007 MT 246, ¶ 16, 339 Mont. 240, 168 P.3d 691. We will not disturb a district court's decision on appeal under these circumstances unless "there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion." *In re M.N.*, 2011 MT 245, ¶ 14, 362 Mont. 186, 261 P.3d 1047.

DISCUSSION

¶18 *Did the District Court abuse its discretion in determining that the Department proposed an appropriate treatment plan?*

¶19 A district court, in terminating parental rights, must consider whether "an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful." Section 41-3-609(1)(f)(i), MCA. Courts accordingly must first determine whether the Department has provided an "appropriate" treatment plan. *In re D.B.*, ¶ 31. No bright-line test exists for courts to determine whether a treatment plan is appropriate. Instead, courts consider various factors, including whether the parent was

5

represented by counsel, whether the parent stipulated to the plan, and whether the plan "takes into consideration the particular problems facing both the parent and the child." *In re D.B.,* ¶ 32.

¶20 Father concedes that he failed to engage in a parenting assessment as required by his treatment plan. He nevertheless argues that this assessment constituted an inappropriate requirement. Father acknowledges that he stipulated to this requirement while represented by counsel. Father argues that the parties were suffering from a fatal assumption in agreeing to this requirement—that D.B. would engage actively in a relationship with Father.

¶21 Father contends that the Department stubbornly failed to re-evaluate his treatment plan in light of D.B.'s resistance to a relationship. Father contends that he was left in an untenable situation: undergo the parenting evaluation and possibly cause D.B. further trauma; or skip the parenting evaluation to prevent trauma to D.B. and not comply with the parenting evaluation.

¶22 Father never previously expressed concern, however, about D.B.'s well-being when he declined to return to Montana. Father instead became angry over D.B.'s fear. Father expressed concern about being arrested if he returned to Montana. Father refused to visit D.B. if the Department required supervised visits while Mother had unsupervised visits. Father never raised the concern that his visit to Montana could cause potential trauma to D.B. The record offers no support, other than Father's testimony, of Father's contention that he failed to comply with the treatment plan to spare trauma to D.B.

¶23 Moreover, no fatal assumption existed regarding D.B.'s attitude towards Father. The Department's petition to designate D.B. a youth in need of care stated that D.B. had no desire

to live with Father. The Department deemed a parenting assessment necessary to better understand the potential problems regarding the relationship. The Department hoped that the assessment would help address D.B.'s fear of Father. The Department also sought the assessment to assist its development of a plan to build a relationship between D.B. and Father. Father took no issue with this approach when he stipulated to the treatment plan while being advised by counsel. Father offers no alternative to how the Department should have addressed D.B.'s fear without this parenting evaluation.

¶24 *Did the District Court abuse its discretion in determining that Father would be unlikely to change within a reasonable amount of time?*

¶25 A district court must determine whether the parent's behavior will change within a reasonable amount of time. Section 41-3-609(2), MCA. This determination requires that the District Court primarily consider the physical, mental, and emotional needs of the child. Section 41-3-609(3), MCA. That is, the court must be foremost concerned with the child's best interest when evaluating whether to terminate parental rights. *See* § 41-3-609(3), MCA; *In re B.S.*, 2009 MT 98, ¶ 32, 350 Mont. 86, 206 P.3d 565.

¶26 The District Court noted Father's testimony at the termination hearing demonstrated "rigid and concrete thinking." Father continually refused to put D.B.'s needs over his own interests. Indeed, Father repeatedly failed to cooperate with the Department. The Department paid for Father's plane tickets to Montana and arranged to pay for his hotel room for parenting assessment. Father still refused to attend parenting assessment.

¶27 Father also threatened Department officials and D.B.'s therapist on numerous occasions. When D.B.'s therapist advised Father that empathizing with D.B. would make

7

D.B. less afraid of Father, Father responded by accusing his son of lying. Father alleged that Mother's family had manipulated D.B. He threatened to hire a private investigator to validate these accusations. Father took no responsibility for his poor relationship with his son.

¶28 Despite Father's actions, the Department continually extended the deadline for Father's completion of the treatment plan. The Department initiated termination proceedings only after 20 months of Father's continued failures to engage in a parenting relationship. By that point, Father told the Department that he did not see the point in completing his treatment. Father continually manifested, over an extended period of time, that he would not take the steps necessary to form a relationship with D.B. The District Court did not abuse its discretion in concluding that Father's behavior would not change within a reasonable amount of time.

¶29 *Did Father receive ineffective assistance of counsel?*

¶30 The Due Process Clause of the Montana Constitution provides a parent in a termination of parental rights proceeding with the right to effective assistance of counsel. *In re A.S.*, 2004 MT 62, ¶¶ 12, 20, 320 Mont. 268, 87 P.3d 408. A parent may sustain no ineffective assistance claim, however, when the parent cannot demonstrate prejudice as a result of the ineffective assistance. *In re C.M.C.,* 2009 MT 153, ¶ 30, 350 Mont. 391, 208 P.3d 809.

¶31 Father argues that effective counsel would have advised him not to stipulate to the treatment plan at the show-cause hearing and would have contested that D.B. qualified as a youth in care. Father emphasizes that D.B. had entered the Department's temporary legal

custody due to Mother's substance abuse and domestic violence issues. Father contends that insufficient evidence existed, other than his stipulation, to determine that Father's actions had contributed to D.B.'s abuse and neglect. Father argues that counsel should have recommended that Father not sign any stipulations due to his status as the non-offending parent.

¶32 Father cannot establish prejudice even if we were to assume that his counsel had acted ineffectively. Father's extensive criminal history included arrests for violent behavior and a recent violation of Father's probation. Father had little contact with D.B. throughout his life. Moreover, D.B. had no desire to live with Father based on these limited interactions. Finally, Father admitted to having had substance abuse problems. The Department readily would have uncovered these facts had Father's counsel engaged in an adversarial process. These factors sufficiently established that a decision by the court to place D.B. in Father's custody would have put D.B. in danger of being abused, neglected, or both. Father can demonstrate no prejudice in light of these circumstances. He accordingly lacks any basis for this Court to determine that he received ineffective assistance of counsel. *In re C.M.C.,* ¶ 30.

¶33 Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ JIM RICE

9