DA 15-0160

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 27

IN THE MATTER OF:

K.A., A.A., & A. A.,

      Youths in Need of Care.

APPEAL FROM:    District Court of the Ninth Judicial District,
In and For the County of Glacier, Cause Nos. DN 13-01, DN 13-02,
DN 13-03
Honorable Robert G. Olson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Nancy G. Schwartz, N.G. Schwartz Law, PLLC; Billings, Montana

      For Appellee:

      Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General; Helena, Montana

      Emily Von Jentzen, Assistant Attorney General, Child Protection Unit;
Kalispell, Montana

Submitted on Briefs:  November 18, 2015

Decided:  February 2, 2016

Filed:

                                    Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    The Ninth Judicial District Court, Glacier County, entered an order terminating the parental rights of the birth father (Father) to his three minor children, K.A., A.A., and A.A. Father appeals the District Court's decision. We affirm, and address the following restated issue on appeal:

¶2    *Did the District Court err in terminating Father's parental rights?*

## PROCEDURAL AND FACTUAL BACKGROUND

¶3    The subject family consists of Father, the birth mother (Mother), and three minor children, ages seven, two and one, respectively, at the time of removal. Concerns were initially raised regarding this family in early 2013, when the Department of Public Health and Human Services (DPHHS or Department) received anonymous reports about the parents using methamphetamines "as often as they can get their hands on it," and reports of physical violence in front of the children. Stephanie Moran (Moran), a social worker, met with the oldest child, K.A., at school on March 7, 2013. K.A. appeared to be clean and adequately dressed, and spoke highly of his parents, but mentioned that the family had moved a lot and that his father had lost his job. Moran reviewed K.A.'s school attendance record, and found that he had a significant number of absences and tardies. K.A. explained to Moran that his mother was not waking up in time to get K.A. off to school.

¶4    Moran again met with K.A. at school on March 26, 2013, and K.A. told the case worker that he had not eaten breakfast that day because there was very little food in the

home, and he wasn't sure he was going to eat dinner that night. K.A. also described physical violence between his parents, but denied that Father was physically violent towards him. During this interview, Moran noted with some concern that K.A.'s clothes were dirty and that his shoes had no soles on them and appeared to be falling apart.

¶5 On the same day, Moran made contact with Mother. The family was living in a motel room at this point and Moran observed only a jar of peanut butter and a can of chili on top of the refrigerator, and only bottled water in the refrigerator. Mother told the case worker that the family was out of money and out of public assistance funds until after the first of the month. Later that day, Moran returned to the motel room to meet with both Mother and Father, and questioned both parents about reports of their drug use. Both parents admitted to using methamphetamine within the past two months, and Father admitted to current use of cannabis and alcohol. When Moran asked, both parents agreed to submit to a urinalysis (UA) test that afternoon. When neither parent showed up for the scheduled UA, Moran returned to the motel.

¶6 No one answered the door when Moran knocked, although she knew the family was at home because she had seen K.A. arrive there from school, and she could hear the television and a baby crying from within the room. Fearing for the children's well-being, and due to the lack of cooperation by the parents, Moran contacted law enforcement, who eventually forced open the door to the motel room. Once inside, Moran informed the parents that she was removing the children. Moran testified that Father became very upset, "bouncing all over" the motel room, yelling and screaming with his hands raised.

3

Moran believed that Father's behaviors were consistent with being under the influence of methamphetamine. All three children sat on the bed next to their mother, crying. Backup law enforcement officers were called to the scene; at one point the officers pulled out their Tasers to prevent a physical altercation with Father when he stood on the bed. Moran and law enforcement removed the children from the premises.

¶7 The next day, Father had been arrested on a charge of disorderly conduct arising out of an incident separate from removal of the children, and was unavailable for a UA. Mother submitted to a UA that day and tested positive for cannabis, methamphetamine, and Ecstasy. On April 2, 2013, DPHHS filed a petition seeking emergency protective authority, adjudication of the children as youth in need of care, and temporary legal custody. Attached to the petition was Moran's affidavit, which averred that Father and Mother did not have the resources to meet the basic needs of their children, that both parents were violent and aggressive, and that both parents were currently unable or unwilling to perform parental duties and responsibilities. The District Court promptly granted emergency protective custody, and an adjudicatory hearing was held on April 17.

¶8 At the hearing, Moran provided testimony concerning the above facts to the District Court. She added that Mother had failed to appear for UAs on two separate occasions since the children were removed, but that Mother and Father had provided a UA on April 6, 2013, and both tests were negative for illegal substances. Father testified that he and Mother had never used drugs in front of the children, that he had never physically abused Mother or the children, and that at the time the children were removed,

4

there had been food in the freezer in the motel room. However, the District Court found that both parents had failed to take drug tests when requested, failed to provide for the basic needs of the children, abused the children by using illegal drugs, specifically methamphetamine, neglected to have K.A. attend school regularly, and that returning the children to the home would place them in unreasonable risk of harm. The court adjudicated all children as youths in need of care, granted temporary legal custody to DPHHS, and ordered that treatment plans be developed.

¶9 On June 4, 2013, the District Court signed treatment plans for both Mother and Father, each of which stated a primary goal of reunifying the children with their parents. At the time the plans were signed, Mother had engaged in initial services, but Father had not. The plan required Father to obtain a chemical dependency evaluation and follow all recommendations of that evaluation, and listed as a specific goal to maintain sobriety for "a period of six months." In addition, the Treatment Plan required Father to obtain individual counseling to address mental health issues, to complete parenting and anger management classes, and to stay in regular contact with Moran.

¶10 In early August 2013, DPHHS placed the children with Mother, who was then living with her parents, for a trial home visit. Since that date, the children have remained with Mother. In October 2013, DPHHS filed a petition to extend temporary legal custody of the children for another six months in order to allow the parents more time to complete their treatment plans. At that point, Father had completed in-patient treatment at Montana Chemical Dependency Center, but had not yet begun out-patient treatment,

mental health counseling, or parenting and anger management classes. Upon a stipulation of all the parties, the District Court granted an order extending temporary legal custody for another six months.

¶11 In April 2014, DPHHS again requested an extension of temporary legal custody, given developments in the case, and a hearing was held in May 2014. Moran testified that, although Father had completed his chemical dependency evaluation, was participating in classes again (after having stopped for a period of time), and had completed anger management and parenting classes, he had returned to using alcohol. He was arrested for fighting at a bar and creating a disturbance in April 2014, and had brought "turmoil within the home." Father "went back to the home knowing that he had just been arrested," causing the District Court to express concerns about his drug and alcohol use and for the family's safety. Because Father and Mother were living together at this point with the children, Moran expressed concern about turmoil in the home and Mother's ability to display her protective capacity, concluding that DPHHS wanted additional time to monitor the family situation. Moran reported that Mother had made progress in her Treatment Plan, but that DPHHS still had some lingering concerns, specifically, that while Mother displayed that she was able to recognize threats to her and her children, a question remained about whether Mother was able to actually assert her protective role. The District Court granted DPHHS' petition, noting the family had made progress, but that DPHHS still had reason to be involved, especially in light of Father's recent setbacks in treatment. The results of Father's recent UA had not yet been returned,

and Moran testified that if the UA was positive, the Department believed Father should live separately from the family. The District Court stated that Father had made a serious mistake in continuing to consume alcohol but that, before the Department could remove the children or either parent from the home, the court would conduct an emergency hearing.

¶12 DPHHS received the results of Father's drug test on June 19, 2014, which indicated that he had been using alcohol, methamphetamine, and amphetamines. Days later, DPHHS filed an expedited motion requesting that the District Court order Father to move from the family residence. The District Court held a hearing on July 2 and Father testified that he had been taking cold medication at the time of the drug test, and had not used methamphetamine, to which the District Court responded:

> I don't believe you. Point blank. I don't believe that you didn't use methamphetamines, I think you got up here and lied. I am just gonna say it point blank. I think that's what you did. The Court would have had a much easier time with being less restrictive if you had owned your actions, took responsibility and tried to do something to prevent it from happening again and that's not what I heard.

Despite testimony that Father had already moved out of the house, the District Court ordered that Father live separately from the family until further order of the court, and that the visits between him and the children be supervised. The District Court also ordered that Mother begin work on a supplemental treatment plan, focusing on obtaining financial independence from Father, before the next hearing.

7

¶13 A week later, on July 9, 2014, Father showed up at the family residence intoxicated. When Mother asked him to leave, he refused. Mother called police to remove Father from the premises, reporting that, while Father was not physically violent, she wanted him removed. Mother did not advise police that Father was there in violation of a court order. Father left the premises before police were able to make contact with him.

¶14 Mother filed an objection to the supplemental treatment plan and a motion to dismiss the proceeding on August 18, 2014. At a hearing in September 2014, the drug testing agency testified that it was having problems obtaining drug tests because Father was evading the testing. Testimony was also taken that Father had been unsuccessfully discharged from his out-patient chemical dependency treatment program, had failed to stay in contact with DPHHS, had failed to notify DPHHS of his address changes, and had stopped participating in his treatment plan at all. The District Court continued the restriction on Father living in the family residence, and also took Mother's motion to dismiss under advisement.

¶15 DPHHS filed its own motion to dismiss in November 2014. DPHHS' motion sought to dismiss the case as to both Mother and Father, but to place continuing restrictions on Father, specifically, prohibiting Father from unsupervised contact with his children until he had completed UA testing, mental health treatment, and chemical dependency treatment. DPHHS' motion stated that only Mother had met the "minimum standards for appropriate parenting at this time."

¶16 Mother and Father responded by filing objections to any continuing restrictions upon Father and a joint motion to dismiss the proceeding as against both of them, relying on Mother's progress under her treatment plan. Mother and Father argued that "mother has demonstrated she can adequately protect the children," "the children are safe," and "it is therefore illogical to argue that additional restrictions are needed to protect the children." In its reply, DPHHS requested that, alternatively, if the District Court did not grant its motion to dismiss against Mother and impose restrictions upon Father, that the District Court grant DPHHS leave to pursue termination of Father's parental rights. Stating that it lacked authority to impose continuing restrictions upon the parties after dismissal, the District Court granted leave for DPHHS to petition the court for termination of Father's parental rights, which it did.

¶17 The District Court conducted a hearing on the petition for termination of Father's parental rights in January 2015. Father was represented by counsel but did not attend the hearing. Moran testified to the Department's concerns with Father, including his unaddressed chemical dependency, including his positive testing for alcohol and methamphetamines, his lack of compliance with his court-ordered treatment plan, his complete disengagement from services, and his lack of any contact with the Department since September of 2014.

¶18 In terminating Father's parental rights, the District Court found that Father had completed several treatment plan tasks, but that "the treatment plan has not been successful in addressing birth father's issues with chemical dependency and mental

health which led to the children's removal in this matter." Also noting that Father "stopped participating in Department services over seven months ago and failed to attend the hearing despite having notice," the District Court reasoned that Father's condition was "unlikely to change within a reasonable time" based on his unresolved chemical dependency and mental health issues, and that continuation of the parental relationship would likely result in continued abuse or neglect of the children, concluding that Father's behavior "convinces the Court that continuation of the parent-child legal relationship is not in the children's best interests." The District Court granted DPHHS' motion to dismiss with respect to Mother. Father appeals.

**STANDARD OF REVIEW**

¶19 This Court reviews a district court's decision to terminate parental rights for an abuse of discretion. *In re E.Z.C.*, 2013 MT 123, ¶ 19, 370 Mont. 116, 300 P.3d 1174 (citing *In re T.W.F.*, 2009 MT 207, ¶ 17, 351 Mont. 233, 210 P.3d 174).

> A district court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment, or in excess of the bounds of reason, resulting in substantial injustice. This Court will not disturb a district court's decision on appeal unless "there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion." We review a district court's findings of fact to determine whether they are clearly erroneous and its conclusions of law to determine whether they are correct.

*In re T.S.*, 2013 MT 274, ¶ 21, 372 Mont. 79, 310 P.3d 538 (quoting *In re D.B.*, 2012 MT 231, ¶ 17, 366 Mont. 392, 288 P.3d 160) (internal citations omitted).

¶20  The question of whether a district court properly denied a motion to dismiss is a conclusion of law, which this Court will review *de novo* to determine if the court's interpretation and application of the law are correct. *In re L.V.-B.*, 2014 MT 13, ¶ 12, 373 Mont. 344, 317 P.3d 191 ("We review *de novo* a district court's decision on a motion to dismiss.").

## DISCUSSION

¶21  *Did the District Court err in terminating Father's parental rights?*

¶22  Father argues that the District Court's decision to terminate his parental rights was in error, citing his bond with the children, his ability to support the family, and the absence of evidence that he put his children at risk. He argues the termination of his parental rights was not in the best interest of his children, and that the District Court erred by not dismissing the case.

¶23  Pursuant to § 41-3-609(1)(f), MCA, termination of the parent-child legal relationship may be ordered upon a finding that the child is an adjudicated youth in need of care, and 1) an appropriate treatment plan that has been approved by the court has not been complied with by the parent, or has not been successful; and 2) the conduct or condition of the parent rendering the parent unfit is unlikely to change within a reasonable time.

¶24  Under this statute, Father first contests the adjudication of the children as youths in need of care (YINC). Section 41-3-102(34), MCA, defines a YINC as "a youth who has been adjudicated or determined, after a hearing, to be or have been abused, neglected, or

abandoned." Section 41-3-102(7)(a), MCA, further provides that "child abuse or neglect" is defined as "(i) actual physical or psychological harm to a child; (ii) substantial risk of physical or psychological harm to a child; or (iii) abandonment." We review a district court's conclusion of law for correctness. *See In re T.S.*, ¶ 21. The District Court found after the adjudication hearing that Mother had tested positively for methamphetamine, cannabis, and Ecstasy, both parents had failed to provide UAs upon request, both parents had admitted to using illegal drugs, the parents were failing to meet their children's basic needs, and that the parents were not ensuring that K.A. attended school on a regular basis. These findings were supported by substantial evidence and the children were properly adjudicated as YINC, as the District Court correctly noted several conditions that would have placed the children in substantial risk of physical or psychological harm.

¶25 Regarding compliance with and successful completion of a treatment plan under § 41-3-609(1)(f)(i), MCA, Moran testified at the termination hearing that, although Father completed in-patient chemical dependency treatment, he had been dismissed from out-patient chemical dependency treatment for lack of participation, thereafter tested positive for methamphetamines and alcohol, failed to maintain sobriety, and failed to complete his mental health tasks. There was substantial evidence to support the District Court's factual finding and conclusion of law that "the majority of his plan was not complied with" and "has not been successful." Indeed, Father concedes in his briefing that he did not complete his court-ordered plan.

¶26 Regarding whether Father's conduct or condition rendering him unfit is unlikely to change within a reasonable time, § 41-3-609(1)(f)(ii), MCA, Moran testified that, "[a]t this time the Department's been involved with these children for over 15 months. We have not seen behavioral changes from [Father]. So it's in the children's best interest for permanency." The Court Appointed Special Advocate (CASA) submitted a report to the District Court, stating, "I regret that this action has to be taken with [Father]. I feel that the court has been given no choice but to terminate his rights. . . . [Father] is the one losing out by not complying to[] the rules and not completing his requirements." The record demonstrates that Father was engaging in the same kind of behaviors over a year after the treatment plan was implemented as he was when the children were originally removed from his care. At times he was blatantly resistant to the Department and with his treatment goals and, as the District Court found, deceptive about his behavior. As we have stated on multiple occasions, "[W]e do not have a crystal ball to look into to make this determination, so it must, to some extent, be based on a person's past conduct." *In re M.A.E.*, 1999 MT 341, ¶ 37, 297 Mont. 434, 991 P.2d 972 (citing *In re C.A.R.*, 214 Mont. 174, 187, 693 P.2d 1214, 1221 (1984)). The record of Father's behavior provides abundant support for the District Court's conclusion that "[t]he conduct or condition of birth father is unlikely to change within a reasonable time based on his unresolved mental health and chemical dependency issues." The District Court's conclusion that continuation of the parent child legal relationship will likely result in continued abuse or neglect was supported by the evidence of Father's conduct over the 15 months of the

13

proceeding. Perhaps testimony crucial to establishing Father's potential to change his conduct within a reasonable time would have come from Father himself; however, he did not participate in the termination hearing. In terminating Father's parental rights, the District Court clearly did not abuse its discretion. "A child's need for a permanent placement in a stable, loving home supercedes [sic] the right to parent a child." *In re Custody & Parental Rights of D.A.*, 2008 MT 247, ¶ 21, 344 Mont. 513, 189 P.3d 631.

¶27 Finally, Father contends that the District Court should have dismissed this case when "requested to do so by the parents and by DPHHS." He argues that both Mother's motion to dismiss, and the parents' joint motion, met the statutory criteria for dismissal, as evidenced by DPHHS' own motion to dismiss. Section 41-3-424, MCA, provides, in pertinent part, that the court shall dismiss an abuse and neglect petition if all the following criteria are met:

> (1) a child who has been placed in foster care is reunited with the child's parents and returned home; (2) the child remains in the home for a minimum of 6 months with no additional confirmed reports of child abuse or neglect; and (3) the department determines and informs the court that the issues that led to department intervention have been resolved and that no reason exists for further department intervention or monitoring.

Section 41-3-424, MCA. In its motion to dismiss, DPHHS expressed its continuing concerns regarding Father's issues that led to its original intervention with this family, asking either for restrictions to be placed on Father's visitation, or alternatively, that DPHHS be granted leave to petition to terminate Father's parental rights. The District Court recognized these continuing concerns, and correctly denied the motions to dismiss

14

for not satisfying the statutory criteria. The District Court ultimately granted DPHHS' motion as to Mother, but only in conjunction with terminating Father's parental rights, as that action resolved the need for further intervention with Father or for placement of restrictions upon his interaction with the family.

¶28 Affirmed.


/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT



Justice Laurie McKinnon, dissenting.

¶29 I disagree with the Court's conclusions that the conduct or condition rendering Father unfit was unlikely to change within a reasonable time and that; therefore, continuation of the parent-child legal relationship will likely result in his children's continued abuse or neglect. Factors the trial court must consider in determining whether the conduct or condition rendering a parent unfit is "unlikely to change within a reasonable time" are found in § 41-3-609(2), MCA. They are:

15

(a) emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;
(b) a history of violent behavior by the parent;
(c) excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child; and
(d) present judicially ordered long-term confinement of the parent.

Overall, "the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child." Section 41-3-609(3), MCA.

¶30 The relevant factors the District Court must have considered in this case concern whether Father had a history of violent behavior, subsection (b), and whether Father's excessive use of alcohol or drugs affected his ability to care and provide for his children, subsection (c). Related to subsection (b), there were allegations of physical abuse, but no evidence of any specific instance of physical abuse concerning Father and Mother or the children. The first tip DPHHS received concerning the family alleged physical violence in front of the children; however, there was no evidence supporting that allegation. Both Mother and Father denied any physical abuse occurred between them or against the children. K.A. told Moran that Father had never hit him. Father was arrested twice for disorderly conduct and for being involved in a disturbance at a bar; however, those two events did not involve anyone in Father's family or occur within their presence. The record does not establish that Father has a history of violent behavior which will result in continued abuse or neglect of his children.

¶31 Regarding subsection (c), there is evidence Father used drugs and alcohol; however, no evidence that the drug or alcohol use caused any specific danger to the

16

children or was done in the children's presence. Review of the record indicates Father tested negative for all substances on April 6, 2013. Father failed to attend several UAs. Father completed in-patient treatment at Montana Chemical Dependency Center on October 15, 2013, and afterwards participated in, but did not complete, out-patient treatment. After removal, Father tested positive, on one occasion, for methamphetamine in a hair sample taken on June 13, 2014 and reported to DPHHS on June 19, 2014. Father was intoxicated when Mother called the police to remove him from her and the children's home on July 9, 2014. Although there was one positive methamphetamine test and one instance of Father being intoxicated at the children's home, these instances are insufficient to clearly and convincingly establish that Father's use was "excessive" or affected his "ability to care and provide" for his children.

¶32 Furthermore, in this case, there was evidence that continuation of the parent-child relationship was not likely to result in continued abuse or neglect because testimony indicated Mother had, over the course of the 18-month proceeding, developed an ability to protect her children. Mother complied with DPHHS recommendations in her Treatment Plan and learned to protect her children. Review of the record shows she demonstrated an ability to protect the children when she removed them from the home when she and Father argued or when Father was intoxicated. She asked Father to move out of the family home after his methamphetamine-positive hair test. She further demonstrated her ability and commitment to protect her children by calling the police

17

when Father came to where she and the children were living, when he was not supposed to be there at all, and refused to leave.

¶33 Children have been in Mother's care since August 2013 without incident. Father is likely living with Mother and the children, in violation of the District Court's order, as he was served with notice of the termination hearing at the Mother and the children's home. Although we have recognized that a child's placement with one parent has no bearing on the parental rights of the other parent, *In re L.V-B*, ¶ 19, placement with a parent who has demonstrated an ability to protect may be relevant to whether the child will likely be subjected to continued abuse or neglect by the other parent. Had Mother been unable to demonstrate an ability to protect the children absent termination of Father's rights, then termination may have been appropriate to preserve at least one parent's relationship with the children. Here, there was not, in the first instance, clear and convincing evidence that continuation of Father's relationship with the children would result in continued abuse or neglect. The finding that Mother was able to protect the children in the event of hostility or drug abuse on the part of Father should have further informed the trial court in its discretion regarding the termination of Father's parental rights. We recognize that these distinctions are difficult to observe given the complexity of family dynamics. Nevertheless, the court must always be guided by considerations of the best interests of the children, despite the unearned benefit which may be reaped by the parent unable to fully comply with the responsibilities and obligations of parenting.

¶34    Terminating a parent-child relationship "divests the child and the parents of all legal rights, powers, immunities, duties, and obligations with respect to each other . . . except the right of the child to inherit from the parent." Section 41-3-611(1), MCA. One such divested obligation is that of support and education. Section 40-6-211, MCA. Here, Father's children were ages nine, four, and two at the time of termination. Terminating Father's parental rights also extinguished Father's obligation to provide for their support. The record establishes that Father is employed in the oil industry and capable of providing support to his children. Thus, Father's ability to provide support for up to sixteen years should have been a consideration in determining whether the children's best interests necessitated termination.

¶35    Additionally, the record establishes Mother wanted her relationship with Father to continue and that the children had a "strong bond" with Father. CASA and the children's attorney counseled against termination. DPHHS stated they wanted Father to have supervised visits with his children but could not achieve that result in the pending proceeding. Instead, DPHHS advocated for termination, even though Moran testified she otherwise did not think termination was in the children's best interests because Mother would not be able to receive child support from Father and the children have a strong relationship with Father.

¶36    The District Court failed to appropriately give primary consideration to the needs of the children. There is insubstantial evidence that Father posed a risk or danger to his children or that continuation of their relationship would result in continued abuse or

neglect. The District Court conceded at the end of the termination hearing that it did not know whether Father represented a danger at all, telling Mother, "The father of your children. They think he's a danger. And quite frankly, I'm not certain if he is or not." If the District Court was uncertain whether Father posed a danger to his children, than its conclusion that continuation of the parent-child legal relationship would result in continued abuse or neglect was certainly not supported by clear and convincing evidence. The District Court's order terminating Father's parental rights should be reversed.

/S/ LAURIE McKINNON