Chief Justice Mike McGrath delivered the Opinion of the Court.
***212 ¶ 1 T.M. (Mother) appeals from an order of the Fourth Judicial District Court, Missoula County, terminating her parental rights to her natural child X.M. We affirm.
¶ 2 We restate the issues on appeal as follows:
1. Whether Mother was denied due process in the proceedings to terminate her parental rights.
2. Whether the District Court abused its discretion in terminating Mother's rights.
FACTUAL AND PROCEDURAL BACKGROUND
¶ 3 Mother recently aged out of foster care. Her childhood was fraught with physical and sexual abuse. She was removed from her parents at an early age and spent her adolescence in foster care, hospitals, and group homes. Due to the negative experiences in her past, Mother is paranoid and distrustful of group homes and the Department of Health and Human Services (Department). Mother also has low cognitive ability.
¶ 4 X.M. was born in March 2016 in Helena, Montana.[1] Two days before X.M.'s birth, Mother checked out of the women's residential group home where she was residing. The home notified the Department because Mother was young and had a history of mental illness and low cognitive ability.
¶ 5 After X.M.'s birth, the Department helped Mother develop a voluntary services agreement enabling her to stay at the home of a family friend. Shortly thereafter, Mother expressed concern for X.M.'s safety due to domestic violence in the home. On April 1, 2016, the Department removed X.M. from Mother's care after X.M. was hospitalized and diagnosed with non-organic failure to thrive. X.M. was dehydrated and had lost weight since birth.
¶ 6 On April 8, 2016, the Department filed a petition for Temporary Investigative Authority (TIA) and Temporary Legal Custody (TLC) based on hospital reports that Mother had difficulty waking to feed ***213 X.M., needed assistance in making formula, failed to recognize when X.M. needed his diaper changed, and was co-sleeping with X.M. to the point of endangering him. After holding a contested show cause hearing on May 18, 2016, the court granted the Department TIA for ninety days. At Mother's request, the Department placed X.M. with her former foster parents in Somers, Montana. Mother moved to Missoula, Montana, and on July 13, 2016, the case was transferred from Lewis and Clark County to Missoula County.
¶ 7 The court postponed adjudication hearings, but still held status updates until Mother was appointed a Guardian Ad Litem (GAL). During this time, the Department arranged bus transportation and lodging for Mother to travel to Kalispell, Montana, for two, two-hour visits with X.M. per month. By October, the Department arranged additional *923 weekly two-hour visits with X.M. in Polson, Montana.
¶ 8 On November 7, 2016, the court adjudicated X.M. as a youth in need of care (YINC), and granted the Department TLC for six months, which was subsequently extended six additional months. On December 27, 2016, Mother signed and agreed to complete a treatment plan drafted by the Department with input from Mother's GAL. Mother's GAL and attorney also signed the treatment plan. On January 6, 2017, the court deemed the treatment plan appropriate and ordered Mother to complete it.
¶ 9 Mother's treatment plan required that Mother: visit, call, or write to X.M. every week; enroll in and complete a Missoula SafeCare program (SafeCare), a parenting curriculum; obtain a parent-child relationship assessment; demonstrate an ability to meet X.M.'s basic needs while protecting him from alcohol, drugs, violence, and unsafe people; complete neuropsychological and psychological evaluations; follow the recommendations of all professionals working on her case; obtain and maintain safe, stable housing; and maintain weekly contact with her caseworker.
¶ 10 Maintaining weekly visitation with X.M. was challenging for both the Department and Mother because Mother had to travel to Kalispell and Polson to see X.M. Mother required frequent reminders regarding transportation logistics, and frequently missed her ride at the scheduled time and place. During visits, Mother's parenting coaches noted Mother's love for X.M., but observed that Mother needed near-constant supervision, prompting, and cuing to maintain focus on X.M.'s needs over her own.
¶ 11 Mother completed a parent-child relationship assessment in April 2017, which recommended close monitoring of Mother's parenting skills and increased visitation to determine if Mother could ***214 independently and safely care for X.M. Mother's unstable housing precluded implementation of those recommendations. Mother also failed to complete any SafeCare modules, even those achievable without X.M. in her care.
¶ 12 Mother completed a neuropsychological evaluation on March 16, 2017, which revealed moderate neurocognitive disorder, ADHD, bipolar disorder, paranoid personality disorder, and moderate, generalized cerebral dysfunction. The evaluation concluded that Mother struggled with decision-making and problem-solving, would have trouble learning new information, and would need to adequately address her mental health conditions with medication and consistent therapy before X.M. could safely live in her care.
¶ 13 Mother also completed a psychological evaluation, which revealed paranoid personality disorder, mood disorder, and "severe and chronic psychiatric symptoms" like lack of insight, a tendency to blame others for her problems, and significant difficulty in taking care of her own daily needs. The evaluation concluded it was unlikely Mother would be able to function as a responsible adult and reliable parent for a toddler without making substantial changes regarding her psychological functioning.
¶ 14 Throughout this period, Mother bounced between couches, hotel rooms, and homeless shelters in Lewis and Clark, Missoula, and Flathead Counties. On June 6, 2017, Mother became a resident at Mountain Home Montana, a safe and stable residency program for young mothers. The Department transported X.M. to Mountain Home Montana for four-hour supervised visits with Mother, until Mother was evicted from the residency program on July 19, 2017, for failure to abide by the program's rules and contract provisions.
¶ 15 In sum, Mother did not follow the recommendations of the professionals working on her case, missed appointments resulting in her discharge from therapeutic services, refused recommended medication regimens, and had unstable housing.
¶ 16 On November 6, 2017, the Department petitioned to terminate Mother's parental rights pursuant to § 41-3-609(1)(f), MCA. The District Court held a hearing on December 27, 2017, and on January 23, 2018, the District Court issued an order terminating Mother's parental rights, from which Mother appeals. The District Court never doubted Mother's love for X.M. However, it *924 could not overlook Mother's inability to parent independently, her unsafe and unstable housing situation, and her unaddressed mental health and psychiatric conditions in considering what was best for X.M. The District Court ultimately found that Mother failed to complete her treatment plan ***215 and that "continuation of the parent-child legal relationship between [Mother] and [X.M. would] likely result in [X.M.]'s continued abuse and/or neglect and [that it was] in [X.M.]'s best interests to terminate [Mother]'s parental rights."
STANDARD OF REVIEW
¶ 17 This Court reviews a district court's decision to terminate parental rights for an abuse of discretion. In re A.S. , 2016 MT 156, ¶ 11, 384 Mont. 41, 373 P.3d 848. A district court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice. In re K.A. , 2016 MT 27, ¶ 19, 382 Mont. 165, 365 P.3d 478. This Court reviews a district court's findings of fact for clear error and conclusions of law for correctness. In re M.V.R. , 2016 MT 309, ¶ 23, 385 Mont. 448, 384 P.3d 1058. Whether Mother was denied due process is a question of constitutional law, over which this Court exercises plenary review. In re M.V.R. , ¶ 24.
DISCUSSION
¶ 18 "A parent's right to the care and custody of a child is a fundamental liberty interest which must be protected by fundamentally fair procedures." In re D.B. , 2007 MT 246, ¶ 17, 339 Mont. 240, 168 P.3d 691. Section 41-3-609(1)(f), MCA, provides the procedure a court must follow in terminating the parent-child relationship of an adjudicated YINC. Before the court may terminate the parent-child relationship of a YINC, the court must find by clear and convincing evidence that: (1) an appropriate court-approved treatment plan was not complied with by the parents or was not successful; and that (2) the conduct or condition of the parents rendering them unfit was unlikely to change within a reasonable time. Section 41-3-609(1)(f)(i), (ii), MCA.
¶ 19 A treatment plan is appropriate if it is case specific and comports with the Department's mandate set forth in § 41-3-423(1), MCA, to make reasonable efforts to reunify families. In re D.B. , ¶ 32-33 ; In re A.N. , 2000 MT 35, ¶¶ 26-27, 298 Mont. 237, 995 P.2d 427. In the case of a disabled parent, an appropriate treatment plan considers the parent's disability and is customized to meet those particular needs. In re D.B. , ¶ 34. The Department "has a special duty to assist [the disabled parent] in prioritizing and scheduling" tasks. In re D.B. , ¶ 37. However, the Department must make "reasonable efforts," not "herculean efforts." In re K.L. , 2014 MT 28, ¶ 41, 373 Mont. 421, 318 P.3d 691. In termination proceedings, the district court must ***216 determine whether the parent complied with the court-approved treatment plan. Section 41-3-609(1)(f)(i), MCA. This Court determines the adequacy of court-approved treatment plans on appeal.
¶ 20 Before terminating parental rights, the district court must also determine whether the parent is likely to change the conduct or condition rendering them unfit within a reasonable time, including the parent's "emotional illness, mental illness, or mental deficiency." Section 41-3-609(1)(f)(ii), (2)(a), MCA ; In re D.B. , ¶ 39. In making this determination, the district court gives "primary consideration to the physical, mental, and emotional conditions and needs of the child." Section 41-3-609(3), MCA ; In re D.B. , ¶ 40.
¶ 21 While these statutes ensure that parents receive fundamentally fair process in termination proceedings, "the child's health and safety are of paramount concern." Section 41-3-101(7), MCA. The district court's foremost priority is the best interests of the child. In re T.S. , 2013 MT 274, ¶ 30, 372 Mont. 79, 310 P.3d 538. There is a presumption that the child's best interests are served by termination of parental rights if the child has been in foster care for more than fifteen of the last twenty-two months. Section 41-3-604, MCA ; In re D.B. , ¶ 40.
¶ 22 1. Whether Mother was denied due process in the proceedings to terminate her parental rights.
¶ 23 Mother argues that the Department violated her due process rights by failing *925 to make reasonable efforts to unify her with X.M. The provisions of §§ 41-3-609(1)(f), and -423(1), MCA, are designed to protect Mother's right to due process. The District Court's decision followed § 41-3-609(1)(f), MCA, and provided Mother with fundamentally fair process. Section 41-3-609(1)(f)(i), MCA, required that the District Court adopt an adequate treatment plan for Mother. Section 41-3-423, MCA, also required the Department to make reasonable efforts to reunify Mother with X.M.
¶ 24 The Department placed X.M. with the foster family in Somers, Montana, because Mother trusted the family and recommended the placement. The Department then arranged and paid for transportation and lodging so that Mother could visit X.M. weekly and work on developing her parenting skills. While Mother's ability to spend time with X.M. was limited, the Department designed Mother's treatment plan to build her parenting skills and increase visitation once Mother obtained stable housing and X.M.'s safety could be monitored. The Department sought input from Mother's GAL so that Mother's treatment program would specifically address Mother's needs. Mother, Mother's GAL, and Mother's attorney signed the treatment program and the court approved it.
***217 ¶ 25 The Department offered Mother the opportunity to live at several residential group homes where she could be monitored and work on completing her treatment plan. Due to Mother's past experiences in group home settings, she refused, or in the case of Mountain Home Montana, was evicted. The Department held monthly meetings with Mother, Mother's GAL, Mother's attorney, and Mother's service providers, helped facilitate Mother's parent-child relationship assessment and psychiatric, psychological and neuropsychological evaluations, and referred Mother to services including SafeCare, visit coaching, and therapy-parenting classes.
¶ 26 The statutory criteria for termination of parental rights must be proved by clear and convincing evidence. In re T.D.H. , 2015 MT 244, ¶ 28, 380 Mont. 401, 356 P.3d 457. Here, the evidence indicates that the Department developed an appropriate treatment plan specifically designed to help Mother reunite with X.M. and made reasonable efforts to help Mother complete it. Mother did not complete the treatment plan. Clear and convincing evidence demonstrates that the process was fundamentally fair.
¶ 27 2. Whether the District Court abused its discretion in terminating Mother's rights.
¶ 28 Mother argues that the District Court abused its discretion in determining she was unlikely to change the conditions making her an unfit parent within a reasonable time. Specifically, Mother argues that she was not given the time or opportunity to prove her ability to change and develop safe parenting skills.
¶ 29 While this Court sympathizes with Mother's argument, the focus of the analysis at this point is the health and safety of X.M. See § 41-3-609(3), MCA ; In re D.B. , ¶¶ 39-40. This Court acknowledges that Mother's love for X.M. is uncontested, and that developing parenting skills requires Mother to have time with X.M. to develop those skills. However, this Court cannot ignore Mother's mental health and cognitive deficiencies in considering the best interests of X.M. See § 41-3-609(2)(a), MCA. Mother's inability to maintain a safe and stable environment for herself precluded increased visitation with X.M. The professionals working on Mother's case unanimously observed that without constant supervision, X.M. was not safe in Mother's care. Mother has low cognitive ability and her mental health issues are severe and chronic. Mother admittedly faced an uphill battle to demonstrate she was capable of change within a reasonable time. She did not help her case by refusing medication regimens and the opportunities available for more stable housing. Mountain Home Montana provided Mother's best opportunity to increase visitation with ***218 X.M. and develop parenting skills with constant oversight and coaching, yet Mother failed to abide by curfew and chores rules, resulting in her eviction. Considering the health and safety of X.M., the District Court properly determined that the conditions rendering Mother unfit to *926 parent X.M. were unlikely to change within a reasonable time.
CONCLUSION
¶ 30 The District Court did not abuse its discretion in terminating Mother's parental rights. Clear and convincing evidence demonstrated that Mother's treatment plan adequately addressed her specific needs and that Mother did not complete the treatment plan. Moreover, Mother's condition was unlikely to change within a reasonable time. The District Court properly followed the statutory criteria and thus did not violate Mother's due process rights in terminating her parental rights.
¶ 31 Affirmed.
We Concur:
JIM RICE, J.
JAMES JEREMIAH SHEA, J.
INGRID GUSTAFSON, J.
DIRK M. SANDEFUR, J.

The parental rights of X.M.'s father, R.C., were previously terminated.