FILED

01/26/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0160

DA 20-0160

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 16N

IN THE MATTER OF:

T.K.,

      A Youth in Need of Care.

APPEAL FROM:    District Court of the Tenth Judicial District,
In and For the County of Fergus, Cause No. DN-2017-03
Honorable Jon A. Oldenburg, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Taryn Gray, Driscoll Hathaway Law Group, Missoula, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Damon Martin, Assistant Attorney General, Helena, Montana

            Kent M. Sipe, Fergus County Attorney, Lewistown, Montana

Submitted on Briefs:  November 12, 2020

Decided:  January 26, 2021

Filed:

_____
                Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1    Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2    T.K. was born in 2012; however, since January 31, 2017, T.K. has been in the Department of Public Health and Human Services' (Department) custody.[1] The Department became involved after Mother attempted to light a wood stove in her home by spraying lighter fluid into the stove causing the building to burn down. Mother was injured with second degree burns, and T.K.'s jacket caught on fire though he was not physically harmed. Following the fire, Mother tested positive for methamphetamine and marijuana at the hospital. Mother was subsequently charged with felony negligent arson, felony criminal possession of drugs, and felony negligent endangerment.

¶3    On January 31, 2017, the Department filed a petition for emergency protective services (EPS), adjudication as youth in need of care (YINC), and for temporary legal custody (TLC) of T.K. The District Court granted EPS, and a Guardian Ad Litem was appointed. On February 9, 2017, Mother had a substance use assessment at Aspen Assessment & Counseling Services (Aspen), which diagnosed Mother with severe stimulant use disorder. Aspen recommended Mother participate in outpatient substance

---

[1] T.K.'s Father is still unknown.

use treatment for a minimum of six months with drug patch monitoring, obtain mental health services, participate in parenting classes, and receive in-home support services from the Department. On February 14, 2017, the court held a show cause hearing, and the parties stipulated to the findings.

¶4 To allow time for Mother to receive treatment, the adjudicatory hearing was set for July 2017. On April 20, 2017, Mother was admitted to the Montana Chemical Dependency Center (MCDC) for approximately one month. Mother's drug patches were positive in June 2017. On July 6, 2017, Mother appeared in court and stipulated to the adjudication of T.K. as a YINC, and the District Court granted the Department TLC for 6 months.

¶5 On July 25, 2017, Mother signed a treatment plan. The treatment plan included requirements that Mother refrain from any illicit drug and alcohol use, participate in treatment and monitoring, continue mental health counseling, and follow the counselor's recommendations, maintain stable and appropriate housing for herself and T.K., obtain approval from the Department for any roommate(s), maintain stable employment documented through legal means, and attend parenting classes. In all, Mother had ten objectives in her treatment plan. That same day, Aspen terminated services due to Mother's continuous positive patch results and her noncompliance with treatment.

¶6 On September 26, 2017, Mother pled guilty to negligent arson and criminal possession of dangerous drugs related to the January fire, and was given a three-year deferred imposition of sentence.

¶7 Mother had T.K. for multiple overnight visits, and at a March 15, 2018 hearing, the Department indicated Mother had made progress and that the plan was moving towards

reunification. Mother stipulated to an extension of TLC, which the court granted for up to six months. However, on May 15, 2018, Mother tested positive for methamphetamine and her unsupervised visits with T.K. were stopped. On September 11, 2018, Mother stipulated again to extension of TLC. Mother was admitted to Rocky Mountain Treatment Center on February 1, 2019.

¶8 On April 11, 2019, the Department filed a petition for termination of parental rights. The affidavit alleged that Mother failed to comply with her court-ordered treatment plan, and that Mother was unlikely to change within a reasonable time. At this point, T.K. had been in kinship care with his maternal grandparents for 26 months.

¶9 On May 6, 2019, the court held a hearing. Child protection specialist Christopher Hildebrandt testified that the Department would continue to work with Mother and give her another chance to parent T.K., but that they were pursuing termination if she did not comply. The court extended TLC again.

¶10 Mother moved in with her fiancé Robin Fink without notice to or permission from the Department as required by her treatment plan. Fink was on probation at the time for distributing illegal articles (methamphetamine) to a jail inmate in 2017.

¶11 On June 11, 2019, three probation officers went to Fink's house for a home check where Mother appeared to be under the influence and told the officers that she used methamphetamine before she arrived at Fink's house. Mother tested positive later that day for methamphetamine. Mother was charged with criminal possession of dangerous drugs related to this incident. As of February 25, 2020, that matter was still pending.

4

¶12     The termination hearing was held on February 14, 2020. Mother testified about her employment, housing, counseling, and other aspects of her treatment. Mother testified that she had relapsed after one of her inpatient treatments. She testified about her struggle to maintain sobriety. Following her arrest, she had been sober for seven months preceding the termination hearing. Mother explained that she had a support group, and that it helped her maintain sobriety.

¶13     Mother also testified about her Urinalysis Assessments (UAs) during her treatment plan monitoring. Mother acknowledged that between October 20, 2017, and October 16, 2018, she had three no shows as well as one positive and 19 dilute UAs. Mother testified that she understood that dilute UAs were considered positives. Mother also testified that she had 14 positive UAs for methamphetamine use between October 20, 2018, and January 22, 2019, in addition to numerous no shows and dilutes. Mother stated that from October 15, 2019, to February 14, 2020, she participated in UAs twice per week with no dilutes, no no-shows, and no positive results.

¶14     Child protection specialist supervisor Elizabeth Bruchez testified that the reason that Mother was transitioned to UAs from drug patches was that Mother had expressed that the patch results were incorrect and providing false positives due to possible environmental exposure to methamphetamine. Mother acknowledged that she was receiving positive drug patch results. She underwent two hair follicle tests following the positive patch results. Mother testified that both hair follicle tests came back negative for illicit drug use.

¶15     The District Court terminated Mother's rights on February 25, 2020, finding that Mother had failed her treatment plan. The court noted that Mother was facing multiple

5

criminal charges with multiple possible criminal sentences for drug-related crimes. Because Mother had already received a deferred sentence and violated the conditions of her plea agreement, she was not eligible for a deferred sentence on the new charges. Moreover, the court found that immediately following in-patient treatment, Mother tested positive for methamphetamine. The District Court made other findings related to Mother's drug use as well as the exceptional length of time that T.K. had been in the Department's custody. The court did note that as of the time of the hearing, Mother had been sober for about seven months. The District Court stated, "It is this Court's hope that the grandparents will allow a clean and productive [Mother] to play a positive and meaningful role in [T.K.'s] life."

¶16 On appeal, Mother argues that the Department failed to prove by clear and convincing evidence that she was unlikely to change within a reasonable time pursuant to § 41-3-609, MCA. Mother also argues that the District Court made two erroneous findings of fact and failed to enter a mandatory finding pursuant to § 41-3-609(2), MCA.

¶17 "A district court's ultimate decision to terminate parental rights is reviewed for abuse of discretion." *In re P.T.D.*, 2018 MT 206, ¶ 16, 392 Mont. 376, 424 P.3d 619 (citation omitted). We review a district court's findings of fact to determine whether the court's findings are clearly erroneous. *In re Declaring A.N.W.*, 2006 MT 42, ¶ 28, 331 Mont. 208, 130 P.3d 619 (citation omitted). "A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if a review of the record convinces the Court a mistake was made." *In re J.B.*, 2016 MT 68, ¶ 10, 383 Mont. 48, 368 P.3d 715 (citation omitted).

6

¶18 A district court may terminate the parent-child relationship if a child is adjudicated a YINC and the court finds "by clear and convincing evidence that: (1) an appropriate court-approved treatment plan was not complied with by the parents or was not successful; and that (2) the conduct or condition of the parents rendering them unfit was unlikely to change within a reasonable time." *In re X.M.*, 2018 MT 264, ¶ 18, 393 Mont. 210, 429 P.3d 920 (citing § 41-3-609(1)(f)(i), (ii), MCA).

¶19 The Department gained custody of T.K. after Mother negligently burned down their home while under the influence of methamphetamine and marijuana. Beginning when T.K. was about four years old he was placed in the custody of the Department and care of his grandparents. T.K. remained in the custody of the Department for over 36 months prior to termination of Mother's parental rights. Mother failed to comply with her treatment plan; Mother's drug evaluation on February 1, 2019, noted that in January 2018 Mother was using methamphetamine twice per week. Mother consistently failed to provide negative patches and UAs. Primarily, Mother provided dilute UAs which she knew were considered positive results. Mother relapsed after inpatient treatment. Mother failed to maintain appropriate housing and failed to obtain permission from the Department to live with her fiancé who was also on probation for using methamphetamine.

¶20 The District Court found, "By [Mother's] own admission, she has used meth for about 15 years and during February of 2019, was using at least twice a week, plus using marijuana." However, testimony, as well as Mother's chemical dependency evaluation show that Mother had been using methamphetamine for approximately four years, not 15.

7

¶21 While the District Court's finding that Mother had used methamphetamine for 15 years was clearly erroneous, the record shows that Mother was using methamphetamine much of the time since T.K. was placed in the Department's care. Mother's regular drug use was to the detriment of and against the best interest of T.K. The record demonstrated that she would be unable to change within a reasonable period of time.

¶22 The District Court did not abuse its discretion by terminating Mother's parental rights. Termination was in the best interest of T.K.

¶23 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶24 Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

Justice Ingrid Gustafson, dissenting.

¶25 Mother asserts and the State does not deny that the District Court entered two erroneous findings of fact: 1) Mother had a 15-year history of methamphetamine use; and 2) during February 2019, Mother was using methamphetamine two times a week, plus marijuana. Neither of these is true. Mother began use of methamphetamine at age 29. At

8

the time of the termination trial, Mother was 33 years old and had been in remission from use for seven months. I do not believe these erroneous findings to be harmless as they provide the underpinnings of the District Court's *implied* finding that continuation of the parent-child relationship would lead to further neglect[1] and are the foundation for the District Court's determination that Mother was unlikely to change within a reasonable period. This is evidenced from the District Court's Order on Petition for Termination of Mother's Parental Rights, "[T]he Court certainly congratulates [Mother] with the positive changes she has made in the last seven (7) months. However, that is a very short period of sobriety when compared to the years of abuse." Seven months of sobriety in comparison to a 15-year history of methamphetamine use in a person who is only 33 years old would reasonably lead to the conclusion that sobriety was precarious at best. Seven months of sobriety when compared to a three-year history of use in a 33-year-old person would more reasonably show that person to be well on the way to long-term sobriety.

¶26 Drug addiction or substance use disorder is a disease that affects a person's brain and behavior. *See* Mayo Clinic Staff, *Drug Addiction (Substance Use Disorder)* (2017), https://perma.cc/KJ8B-6B79. Substance use disorders are treatable and can be successfully managed. While relapse is common[2], relapse does not mean that treatment does not work,

---

[1] The parties also agree the District Court failed to make a specific finding that continuation of the parent-child relationship would lead to further neglect. The State instead argues the District Court implied such a finding.

[2] Recurrence rates are similar to those of other medical illnesses that have both physiological and behavioral components such as hypertension, asthma, and diabetes. National Institute on Drug Abuse, National Institutes of Health, *How Effective is Drug Addiction Treatment?* (2018), https://perma.cc/Q8HM-BJ2H.

but rather indicates the need for more or different treatment. National Institute on Drug Abuse, National Institutes of Health, *Understanding Drug Use and Addiction* (2018), https://perma.cc/PB6R-JCJA. Here, there is no doubt Mother struggled to refrain from drug use following initiation of treatment and suffered relapses. Despite this, Mother continued to engage in treatment[3]—including inpatient programs, outpatient treatment, counseling, and regular participation with AA. By the time of the termination hearing, the evidence suggested Mother had remained in remission for the prior seven months, had a stable residence, had a sponsor, and was continuing to engage in regular AA meetings. Her CPS worker testified she was in substantial compliance with her treatment plan and her sponsor, a detention officer, testified she had seen a real change in Mother, especially over the past six months. In essence, Mother's path to recovery was exactly what would reasonably be anticipated in terms of relapse and time frame. The District Court may very well have interpreted Mother's success and chance for continued sobriety much differently had it appreciated Mother to have used methamphetamine for only three years as opposed to 15. Based on the court's clearly erroneous findings, which were not harmless, I would reverse and remand the matter to the District Court.

---

[3] The State admits the District Court erred in its findings but asserts such was harmless as Mother's three-year struggle with methamphetamine demonstrated a cycle of behaviors from which the Court could conclude there were implied findings that continuation of the parent-child relationship would lead to further neglect and demonstrated Mother would not change. This position shows a complete lack of understanding of the disease of addiction and its expected treatment course. Recognizing relapse is a part of recovery; the goal is to continually expand periods of sobriety and decrease frequency and length of relapse until an individual sustains long-term sobriety. Such a course should be viewed as success rather than failure.

¶27 Setting aside the issue regarding the court's erroneous findings discussed above, in this case, given the District Court's hope the grandparents will allow a drug-free and productive Mother to play a positive and meaningful role in Child's life, a guardianship may well have been a more appropriate disposition than termination and adoption. At the termination hearing, the District Court expressed interest in ordering a guardianship but felt it could not as Mother did not agree or consent to such. Guardianship is one of the permanency options available under § 41-3-445(8), MCA. To order this disposition, there is no requirement the parent consent or agree to it. Here, the child was placed with the maternal grandparents. He was seven years old at the time of the termination hearing and of sufficient age to distinguish his mother and his grandmother and able to understand he was residing with his grandparents while his mother was working to improve her situation. Given the family relationship, the child is reasonably expected to have a continued relationship with his mother and turning his grandmother into his mother and his mother into his sister will likely result in increased confusion rather than increased stability for the child.

¶28 Research has shown the availability of guardianships increases overall family permanence and has shown no appreciable differences in stability among comparable groups of children exiting to adoption as compared to those exiting to guardianship. Children's Bureau, U.S. Dep't of Health & Human Servs., *Synthesis of Findings: Subsidized Guardianship Child Welfare Waiver Demonstrations* 19-20 (2011), https://perma.cc/CNC6-CYER. Resoundingly, the research suggests permanency is more closely tied to the child's relationship with his or her placement than to an ultimate legal

designation. Children's Bureau, U.S. Dep't of Health & Human Servs., *Synthesis of Findings: Subsidized Guardianship Child Welfare Waiver Demonstrations* 18-20 (2011), https://perma.cc/CNC6-CYER. Further, no appreciable differences in child well-being—school performance, safety, engagement in risky behaviors, access to and satisfaction with services and supports, and overall quality of life—have been shown among comparable groups of adopted and guardianship children. *See* Children's Bureau, U.S. Dep't of Health & Human Servs., *Synthesis of Findings: Subsidized Guardianship Child Welfare Waiver Demonstrations* 20 (2011), https://perma.cc/CNC6-CYER. Finally, guardianship in this instance may be preferable given known unintended consequences of adoption, such as when adoption is disrupted by an adoptive parent's death or incapacity. In such cases, it is not unusual to discover that the terminated parent has maintained a relationship with the child and has regained the ability to parent (especially in situations involving prior substance use disorder). In these instances, although the Department believes placement with the parent to then be in the child's best interest, the Department is precluded from placing the child with the parent because of the prior termination. By policy, the terminated parent is a precluded placement option. Guardianship does not impose the same limitation. A guardianship, rather than a termination, leaves open the ability to later place a child with his or her parent upon death or incapacity of the guardian. As such, in situations like this case where it is anticipated the child will continue to have a relationship with the parent, guardianship may lessen an unintended consequence of adoption at a later time.

/S/ INGRID GUSTAFSON