DA 20-0509

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 125N

IN THE MATTER OF:

R.L.L. and U.R.L.,

      Youths in Need of Care.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause Nos. DN 16-111 and
DN 16-112
Honorable Rod Souza, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Kelly M. Driscoll, Driscoll Hathaway Law Group, Missoula, Montana

        For Appellee:

        Austin Knudsen, Montana Attorney General, Brad Fjeldheim, Assistant
Attorney General, Helena, Montana

        Scott D. Twito, Yellowstone County Attorney, Heather Sather, Deputy
County Attorney, Billings, Montana

                  Submitted on Briefs:  April 7, 2021

                            Decided:  May 18, 2021

Filed:

                      _____
                              Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 R.L.L. was born in 2009 and U.R.L. was born in 2011. Mother and Father[1] have an extensive history with the Department of Public Health and Human Services (Department). R.L.L. and U.R.L. (the children) were removed from Mother's and Father's care in 2010 and again in 2011. The children were removed from Mother's care in February 2016 and the Department petitioned for emergency protective services (EPS), adjudication as youths in need of care, and for temporary legal custody (TLC) of the children in March 2016. The Department asserted that Mother was facing serious mental health issues, displaying erratic behavior, and experiencing homelessness. Father was out of state and was also facing homelessness at the time of removal. The District Court granted the Department's petition in May 2016 for EPS but did not adjudicate the children as youths in need of care until May 2018.

¶3 The Department attempted to place the children together and with family members throughout these proceedings, including with their maternal grandmother, maternal great-grandparents, maternal aunt in Billings, maternal uncle in California, and U.R.L.'s

---

[1] Father did not appeal in this matter.

2

adult sister in Billings. None of these placements were viable. U.R.L. was placed in multiple foster homes and a group home. Eventually, U.R.L. was placed with family members and expressed that he wanted to stay there and be adopted. R.L.L. expressed that she wanted to be out of foster care and to be adopted by a family.

¶4 Mother did not have stable housing throughout these proceedings. In 2017, Mother moved from Montana to New Mexico. She stated that she moved to obtain treatment for Crohn's disease, but did not provide supporting documentation or testimony. While in New Mexico, Mother lived primarily at a homeless shelter. She subsequently moved in with a roommate in New Mexico who was unsafe. Mother left that roommate and moved to Colorado in late 2017. She did not present evidence to suggest that her move to Colorado would benefit her or the children. Mother obtained some mental health treatment but did not consistently visit the children or make substantial progress on her treatment plan. She began to establish more consistent phone contact with the children but did not stay in constant contact with the Department.

¶5 Mother's treatment plan was approved by the District Court in June 2018, which required that she complete the plan within six months. The treatment plan requirements included participating in a chemical dependency evaluation and treatment, participating in a mental health evaluation and treatment, attending approved parenting classes, and meeting consistently with the Department.

¶6 In October 2018, Mother was given a bus ticket to a city of her choosing and she chose to move to San Diego, California. The Department asked Mother why she was not moving closer to the children, and she explained that she would not be stable in Montana.

3

¶7 Mother was hospitalized for approximately a month in California due to Crohn's disease. She then moved into the People Assisting the Homeless (PATH) shelter program for five months. With the support of the PATH program, Mother moved into her own studio apartment around May 2019. To keep her housing, Mother was required to attend therapy, meet with her managers, and work with legal aid. While she was in San Diego, the Department amended its petition to terminate her parental rights and requested an extension of TLC. The Department initiated an Interstate Compact on the Placement of Children (ICPC) request for Mother in California.

¶8 California determined that Mother had not completed enough of her treatment plan and denied ICPC. She visited the children in Montana twice in 2019; she had not seen the children since 2017 when she moved from Billings. While Mother's treatment plan required that the Department communicate directly with her mental health care providers, the Department was unable to speak with either of her therapists in San Diego despite multiple attempts to reach them. Mother's case manager at PATH did confirm that she was enrolled and attending their program.

¶9 In April 2020, R.L.L.'s therapist contacted the children's Guardian Ad Litem regarding contact between R.L.L. and Mother that was causing problems for R.L.L.'s placements. One family had hoped to adopt R.L.L., but eventually declined because of Mother's involvement and R.L.L.'s disruptive behavior following visits or communication with Mother.

¶10 In December 2019, the Department filed its petition for permanent legal custody and termination of Mother's and Father's parental rights. In April 2020, after a continuance

4

based on Mother's request, the Department contacted her after learning that she was opposing their petition for termination of parental rights. The Department requested that Mother move to Montana if she wanted to reunify with the children because it would be difficult—even if the court granted a six-month extension—to obtain approval of an ICPC in California. Mother responded that she had an apartment in California and that shelters were closed in Montana so she would not have anywhere to live.

¶11 On July 6, 2020, the District Court held a termination hearing. At the time of the hearing, the children had been in foster care for more than four years following their removal in 2016.

¶12 Child protection specialist supervisor Brittany Anderson (Anderson) testified that she had significant concerns about Mother's and Father's abilities to parent the children. Father failed to maintain stable housing during these proceedings. Mother faced homelessness until 2019 when she obtained housing through the PATH program. She also faced significant mental health issues. Anderson understood that Mother would still be facing homelessness without the support of PATH and was concerned with her stability. Anderson stated that she "directly spoke with [Mother] about [her] treatment plan over 24 times." Nonetheless, Mother moved through her treatment plan slowly and inconsistently.

¶13 Mother testified that if she left San Diego, she would be homeless. She explained that she was relying heavily on the PATH program, which provided her significant resources and stable housing. Mother testified that she had maintained sobriety since 2012, directly contradicting an affidavit submitted by the Department stating that Mother told the Department she had been using marijuana.

5

¶14 The Department presented notes R.L.L. produced while she was in therapy sessions. In all three notes, R.L.L. expressed that she wished she was dead. The District Court held that the notes demonstrated the deep harm R.L.L. experienced while in foster care.

¶15 The District Court held that Mother was not successful in her treatment plan. The court explained that while Mother achieved some stability, she did so primarily because of the PATH program. One major goal of her treatment plan was to achieve independence. The court held that Mother's treatment plan was unsuccessful in part because she did not accomplish her goal of demonstrating that she could make long-term changes herself without intervention from the Department. Mother failed the treatment plan goal of enhancing her parenting skills with regards to the children's physical, emotional, and medical needs. The District Court held that Mother's motivation to parent the children had not improved since their removal, and that she put her own needs before her children's. Furthermore, the court described Mother's continued lack of understanding of this case. For instance, she attributed R.L.L.'s behavioral issues to separation anxiety rather than recognizing that often R.L.L. exhibited negative behaviors following contact with Mother.

¶16 On appeal, Mother argues that the District Court erred in terminating her parental rights. Mother contends she completed her treatment plan, had changed, and was able to care for the children.

¶17 We review a district court's decision to terminate parental rights for an abuse of discretion. *In re R.J.F.*, 2019 MT 113, ¶ 20, 395 Mont. 454, 443 P.3d 387 (citation omitted). We review a district court's findings of fact for clear error and conclusions of law for correctness. *R.J.F.*, ¶ 20 (citation omitted). To reverse a district court's evidentiary

6

ruling for an abuse of discretion, this Court must determine that either the district court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. *R.J.F.*, ¶ 20 (citation omitted).

¶18 A district court may terminate the parent-child relationship if a child is adjudicated a YINC and the court finds "by clear and convincing evidence that: (1) an appropriate court-approved treatment plan was not complied with by the parents or was not successful; and that (2) the conduct or condition of the parents rendering them unfit was unlikely to change within a reasonable time." *In re X.M.*, 2018 MT 264, ¶ 18, 393 Mont. 210, 429 P.3d 920 (citing § 41-3-609(1)(f)(i), (ii), MCA). "[A] treatment plan may properly be considered unsuccessful even if the parent has completed all the required tasks." *In re D.F.*, 2007 MT 147, ¶ 36, 337 Mont. 461, 161 P.3d 825 (citation omitted). District courts must determine whether the parents effectuated the purposes of the treatment plan. *In re I.B.*, 2011 MT 82, ¶ 27, 360 Mont. 132, 255 P.3d 56.

¶19 It is undisputed that Mother completed many of the required tasks of her treatment plan. However, Mother did not effectuate the purpose of her treatment plan, which was to achieve independence and stability so that she could safely care for the children. This included maintaining stable housing that was suitable for the children. Mother did eventually obtain stable housing, but it was not suitable for the children. At termination, Mother was living in a small studio apartment.

¶20 Mother also consistently failed to complete her treatment plan tasks without intervention from the Department. For her treatment plan to be successful, and for her to

reunify with the children, she needed to gain independence from the Department. Mother did not accomplish this important aspect of her treatment plan.

¶21 Finally, Mother did not seem to understand the considerable struggles that the children were facing in foster care and repeatedly failed to put their needs first. R.L.L. was often disruptive in her placements following contact with Mother, and both children wanted stability.

¶22 The District Court did not abuse its discretion by terminating Mother's parental rights. Mother did not effectuate the purposes of her treatment plan nor did she demonstrate her ability to change in a reasonable time period. The children were in foster care for over four years at the time of termination. Termination was in the best interest of R.L.L. and U.R.L.

¶23 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶24 Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR