DA 25-0094

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 20

IN THE MATTER OF:

S.A. and J.P.,

       Youths in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause Nos. BDN-19-272 and BDN-19-273
Honorable Elizabeth A. Best, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Shannon Hathaway, Hathaway Law Group, Missoula, Montana

       For Appellee:

              Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant Attorney General, Helena, Montana

              Joshua A. Racki, Cascade County Attorney, Valerie Winfield, Deputy County Attorney, Great Falls, Montana

Submitted on Briefs:  September 3, 2025

Decided:  February 10, 2026

Filed:

                                  _____
                                      Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 J.A. (Father) appeals the January 2, 2025 Order issued by the Eighth Judicial District Court, Cascade County, terminating his parental rights to his children S.A. and J.P.

¶2 We address the following restated issues on appeal:

1. *Whether the District Court abused its discretion when it terminated Father's parental rights.*

2. *Whether Father may assert claims on behalf of the Tribes related to a general tribal preference for guardianships over terminations.*

¶3 We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶4 Father and Mother, H.P., are the natural parents of S.A. (born in 2018) and J.P. (born in 2019). In June 2018, Father and Mother first came to the attention of social services on the Rocky Boy Reservation because Father was keeping S.A. from Mother, using and selling methamphetamine, and committing domestic violence against Mother. In June 2019, the Montana Department of Public Health and Human Services, Child and Family Services Division (Department), received a report that Father and Mother were using methamphetamine and Father was on the run from law enforcement. In September 2019, the Department removed the Children from the home they were living in with Mother and Mother's parents, as the adults were abusing methamphetamine. Child Protection Specialist (CPS) Wallis placed the Children into protective foster care. At the time, Father's whereabouts were unknown to the Department.

¶5 On September 19, 2019, the Department filed a Petition for Emergency Protective Services (EPS), Adjudication as Youth in Need of Care (YINC) and Temporary Legal

2

Custody (TLC). Because Father's whereabouts were unknown—CPS Wallis was unable to find Father's location after speaking with Mother, the Children's grandparents, and tribal social services—Father was served with the Petition by publication. Both Children are Indian Children within the meaning of the Indian Child Welfare Act (ICWA)[1] as they were eligible for enrollment with the Blackfeet Tribe and Chippewa Cree Tribe.[2] The Children's placement—in licensed foster care with a non-Indian—was not in compliance with the placement preferences of ICWA,[3] but no suitable placement was found by the Department after contacting the Tribes for assistance, interviewing family members, and conducting a Seneca search for other family members. The District Court set a show cause hearing for October 24, 2019. At that hearing, Mother stipulated to show cause. Father did not appear at that hearing, and his attorney stated he had not been able to contact Father and had "no way of finding [Father] at this point" because Father's last known address was no longer any good. The District Court twice began and continued adjudicatory hearings before ultimately proceeding to an adjudicatory hearing on February 27, 2020. Prior to this

---

[1] An "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" 25 U.S.C. § 1903(4). The Indian tribes themselves have the sole power to determine whether a child is an "Indian child." *In re A.G.*, 2005 MT 81, ¶ 13, 326 Mont. 403, 109 P.3d 756.

[2] The Blackfeet Tribe immediately informed the Department both children were eligible for enrollment, while the Chippewa Cree Tribe initially responded that neither child was eligible for enrollment before determining both children were eligible for enrollment on September 7, 2023. Ultimately, S.A. was enrolled as a member of the Blackfeet Tribe and J.P. was enrolled as a member of the Chippewa Cree Tribe.

[3] In the absence of "good cause" to depart from the placement preferences, removed Indian children are to be placed with a member of their extended family, a member of their tribe, or with another Indian family. 25 U.S.C. § 1915(a).

hearing, Father left a voicemail for CPS Larson. When she attempted to call him back, the number was no longer in service and she was unable to leave a voicemail. The Department had prepared treatment plans for both Mother and Father prior to the adjudicatory hearing. Mother stipulated to the District Court adjudicating the Children as YINCs, granting TLC, and approving her treatment plan. Father's counsel stated he had no grounds to oppose adjudication of the Children as YINCs or TLC, but did oppose the court imposing a treatment plan on Father based on the allegations of the Petition. The District Court adjudicated the Children as YINCs and granted TLC, but continued the hearing regarding the imposition of treatment plans. At a subsequent hearing, Father's counsel reiterated his objection to a treatment plan. The court approved only Mother's treatment plan after this hearing.

¶6 During late 2019 to mid-2020, Father was transferred between various detention centers, treatment centers, and pre-release. CPS Larson was able to speak with Father in late July 2020, after he was released from jail on June 16, 2020. She set up visitations with the Children, encouraged Father to contact his attorney, and reviewed Father's proposed treatment plan with him. Father signed releases for the Department, and CPS Larson also gave Father information regarding a contact to search for a possible ICWA-compliant placement for the Children. The Department filed a petition to extend TLC, advising that neither Mother nor Father were complying with their treatment plans. At the next hearing, on August 13, 2020, the District Court orally extended TLC. In its written Order reflecting such, the court noted the need to extend TLC to allow both parents to successfully complete their court-ordered treatment plans and ordered them to "continue to comply with the terms

4

of their treatment plans."[4]  On August 13, 2020, Father was arrested and incarcerated in the Rocky Boy Jail, before later being transferred to the Montana Chemical Dependency Center (MCDC) in Butte.  Prior to his discharge from MCDC, the Department set up visitation for Father with the Children.  CPS Larson informed the court that Father sought to go to an inpatient treatment program in Great Falls after his release and noted she was "very excited about [Father] trying to clean up his act."  While waiting to enter inpatient treatment, Father engaged in chemical dependency treatment in Rocky Boy, attended visits with the Children, and maintained contact with CPS Larson, though he did not engage in drug patch monitoring.

¶7     The District Court again extended TLC following a February 18, 2021 hearing.  A few days later, Father was again arrested and incarcerated in the Rocky Boy Jail.  His deferred sentence in a criminal matter was thereafter revoked and he was committed to the Montana Department of Corrections (DOC) for three years, with no time suspended.  Father was then conditionally released to the Great Falls Pre-Release Center (GFPRC).  While at GFPRC, Father began working, attending Alcoholics Anonymous, wearing a drug patch, attending parenting classes, and attending visits with the Children.  Father was also engaged with mental health services.  The District Court again extended TLC on August 4, 2021, based on the stipulations of both parents.  Father continued to make progress on several tasks from his proposed treatment plan during this time.  Father was released from GFPRC in late 2021, and admitted to a brief relapse with methamphetamine prior to the

---

[4] As previously noted, the District Court had not actually ordered Father's treatment plan at this time.

5

November 18, 2021 status hearing. At that hearing, Father's counsel argued Father had, with the exception of the brief relapse, completed the tasks of his treatment plan and that the Children should be placed in Father's care. The District Court maintained the status of the case following the status hearing.

¶8 The District Court conducted review and status hearings in February and March of 2022, by which time the case had been assigned to CPS Smalls. CPS Smalls noted Father had done well while at GFPRC, but had relapsed after his release and fled from drug testing arranged by CPS Smalls. The Department filed a motion to extend TLC following the February 2022 hearing, which was granted by the court on March 11, 2022. On May 4, 2022, the Department filed a petition to terminate the parental rights of both Father and Mother based on their failures to complete their treatment plans. The District Court held a status hearing on May 5, 2022, where the Department informed the court it had not had contact with Father since March and that he had been arrested and released sometime in April. Father's attorney informed the court he had not had any contact with Father since the last hearing and would be filing a motion to withdraw as counsel. The District Court held another status hearing on August 4, 2022. Father appeared at this hearing with new counsel. Father had been in contact with both his new counsel and CPS Smalls prior to the hearing, and had returned to GFPRC and engaged with both mental health services and chemical dependency counseling. In November 2022, Father was granted leave from GFPRC, failed to return, and was charged with Escape. Father was arrested and placed at the Montana State Prison (MSP).

¶9 On March 28, 2023, the Department filed a motion to extend TLC, noting that, while it had already filed a petition to terminate parental rights, the Department was exploring the possibility of placing the Children into guardianship with "recently disclosed extended family members." The District Court held a hearing on March 30, 2023, where the Department moved to withdraw the petition for termination and extend TLC for six months while the Department explored guardianship. CPS Borger informed the court that two possible kinship placements had been recently identified. After the Department determined neither family member was able or interested in taking the Children, it filed another petition to terminate parental rights, based on a long-term incarceration theory, as both Mother and Father were in prison. At a July 6, 2023 hearing, Mother's counsel advised the District Court that Mother would be filing a motion to transfer the case to the Blackfeet Tribal Court. Counsel for the Blackfeet Tribe was present at this hearing and explained the Tribe was preparing to accept the transfer. Father's counsel explained he needed to travel to MSP to speak with Father to determine if he would object to Mother's transfer petition. The Department filed an amended termination petition on July 17, 2023.

¶10 On August 31, 2023, the District Court held a hearing. Father, who had been transferred from MSP for the hearing, objected to Mother's petition to transfer jurisdiction to the Blackfeet Tribal Court. Mother's transfer petition was accordingly denied. *See* 25 U.S.C. § 1911(b). The District Court also continued the termination hearing, which was ultimately set for November 2, 2023. By the time of that hearing, Father had since been released from custody and had been working with the Department to reengage with services and visitations, gotten a job, and secured food stamps. The

District Court reset the termination hearing and again extended TLC. CPS Borger arranged visitations and telephone visits for Father, arranged for a chemical dependency evaluation, recommended therapy services, and made a referral for in-home services. After his initial reengagement with the Department, Father began to disengage and did not appear for the November 16, 2023 permanency plan hearing or the February 8, 2024 status hearing. Father had begun missing visits with the Children, failed to submit to drug testing, was hospitalized after living on the streets of Billings during a winter storm, and did not obtain a new chemical dependency evaluation as recommended by CPS Borger after Father's previous evaluation did not recommend a high enough treatment program to qualify for sober living.

¶11    On March 21, 2024, the Department filed a Motion, Affidavit, and Brief in Support of Treatment Plan for [Father], requesting the District Court approve a treatment plan after one was not initially approved following the March 12, 2020 hearing. The District Court held the rescheduled termination hearing on March 28, 2024. This hearing was attended by tribal representatives. Father noted he had no objection to the court ordering his treatment plan, asserted he had made progress on several tasks contained within the plan, and asked for a reasonable amount of time to comply with the treatment plan. The Department noted it had "no documentation" of anything Father alleged he was working on and still needed Father to execute releases for his providers and provide a hair sample. The parties also discussed the option of guardianship. Heidi He Does It, representing the Blackfeet Tribe, informed the District Court that the tribe "has a strong preference for guardianship rather than adoption." This sentiment was echoed by Roberta Cross Guns,

8

ICWA qualified expert witness (QEW) for the Blackfeet Tribe. The Department informed the court it did not believe guardianship was in the best interests of the Children. The District Court ordered the Department to, "in good faith," discuss guardianship and ordered Father's treatment plan adopted. The District Court also continued with the termination hearing relating to Mother's parental rights. During that portion of the hearing, QEW Cross Guns and AnnaMarie White, QEW for the Chippewa Cree Tribe, each testified that Mother's continued custody was likely to result in serious emotional or physical damage to the Children. Both QEW Cross Guns and QEW White further testified that guardianship was preferred over termination by the Tribes. At the close of the hearing, the court orally terminated Mother's parental rights based on her long-term incarceration. The District Court issued its written order terminating Mother's parental rights on April 4, 2024. Mother did not appeal the termination of her parental rights.

¶12 The District Court held a permanency plan hearing on May 2, 2024. Father did not appear. At that hearing, the Department informed the court that a general fund subsidy for a guardianship had been approved in case a guardianship was ordered, but that the Department still did not believe guardianship was in the best interests of the Children. The Department noted Father was not maintaining communication with CPS Borger, stopped seeing his treatment provider, was refusing to submit to drug testing, was homeless, and possibly had pending felony criminal charges. He Does It, on behalf of the Blackfeet Tribe, appeared at the permanency plan hearing, where she expressed confusion regarding Mother's parental rights being terminated while a possible guardianship was still being explored. She noted that "the point of the guardianship was to avoid terminating either

9

parent['s] parental rights. If their rights are terminated, then, you know, adoption would be the better choice." The District Court again extended TLC for another six months.

¶13 On July 23, 2024, the Department filed a petition for termination of Father's parental rights due to the failure of his court-ordered treatment plan. The petition noted that Father had been arrested and charged with numerous offenses, including felony assault with a weapon, for threatening a man with a gun. The Department sent notice of its petition for termination to both the Blackfeet Tribe and the Chippewa Cree Tribe, and informed them that the Tribes had the right to intervene in the proceedings pursuant to 23 C.F.R. § 23.111(6)(iii). The District Court held a status hearing on August 1, 2024. Father was transported to the hearing, but left after having an outburst. The District Court maintained all existing hearings, including the pending termination hearing. Jaynah Gopher, representing the Chippewa Cree Tribe, noted she had "nothing to add," but was "really glad to hear the placement is taking the kiddos to the powwow."

¶14 The District Court held a representation and permanency plan hearing on September 5, 2024. At that hearing, the court allowed Father's counsel to withdraw based on an irreconcilable conflict. Father was released from custody later in September and met with CPS Borger in early October. CPS Borger provided Father with a bus pass and money for food and set up an appointment for Father to get his drug patch replaced. CPS Borger again reviewed Father's treatment plan with him during a phone call later in October, and Father stated he would follow up with both chemical dependency and mental health treatment and complete a Section 8 housing form. Father had met with the Children twice and spoken to them on the phone once since his release from jail a month earlier. Father

10

did not follow up with treatment or housing following his phone call with CPS Borger. On November 8, 2024, Father was hospitalized after being found lying on the ground near his vehicle on the highway. His toxicology tests were positive for methamphetamine and marijuana. Three days after being released from the hospital, Father threatened a woman who was giving him a ride with a gun, threatened to kill her, and stole $700 from her. Father was charged with multiple offenses, including three felonies, due to this incident. The District Court held a review hearing on November 14, 2024, and extended TLC.

¶15 The District Court held a termination hearing on January 2, 2025. At that hearing, the representative for the Chippewa Cree Tribe did not appear, while the representative for the Blackfeet Tribe appeared by Zoom at the beginning of the hearing, but left early and without participating. Father asserted he was not contesting that he hadn't completed the treatment plan, but contested that termination for failure to complete the treatment plan was inappropriate due to his repeated incarcerations and there had not been enough time to complete the plan. Father further asserted insufficient weight had been given to the tribal preferences for guardianship. QEW Cross Guns, who appeared as the preferred QEW for both the Blackfeet Tribe and the Chippewa Cree Tribe, testified that active efforts had been made and that, in particular, CPS Borger "went above and beyond," but those efforts were unsuccessful and continued custody by Father was likely to result in serious emotional or physical damage to the Children. QEW Cross Guns noted the efforts began well before Father's treatment plan was officially ordered and Father had been unable to "get it together" in the more than five years since the Children were removed. QEW Cross Guns testified it was in the best interests of the Children that Father's parental rights were

11

terminated. Father testified regarding some of his previous DOC incarceration during the pendency of the case, which led to him filing suit against the State for wrongful incarceration and receiving a settlement. At the close of the hearing, the District Court orally determined the Department had met its burden and that termination of Father's parental rights was appropriate. The District Court issued its written order terminating Father's parental rights on January 2, 2025.

¶16 Father appeals. Additional facts will be discussed as necessary below.

## STANDARD OF REVIEW

¶17 We review a district court's termination of a person's parental rights for an abuse of discretion under both ICWA and Title 41, chapter 3, MCA. *In re B.Y.*, 2018 MT 309, ¶ 7, 393 Mont. 530, 432 P.3d 129. An abuse of discretion occurs when a district court acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice. *In re X.M.*, 2018 MT 264, ¶ 17, 393 Mont. 210, 429 P.3d 920 (citing *In re K.A.*, 2016 MT 27, ¶ 19, 382 Mont. 165, 365 P.3d 478). We review a district court's findings of fact for clear error and its conclusions of law for correctness. *In re M.V.R.*, 2016 MT 309, ¶ 23, 385 Mont. 448, 384 P.3d 1058.

¶18 "Whether a district court has complied with ICWA's substantive and procedural requirements presents a question of law that we review for correctness." *In re S.B.*, 2019 MT 279, ¶ 25, 398 Mont. 27, 459 P.3d 214 (citing *In re L.A.G.*, 2018 MT 255, ¶ 10, 393 Mont. 146, 429 P.3d 629). In an ICWA case, we will uphold a district court's termination of parental rights if a reasonable fact-finder could conclude beyond a reasonable doubt that continued custody by the parent is likely to result in serious

12

emotional or physical damage to the child. *In re P.E.W.*, 2025 MT 114, ¶ 18, 422 Mont. 193, 569 P.3d 613 (citing *In re S.B.*, ¶ 25).

**DISCUSSION**

¶19 *1. Whether the District Court abused its discretion when it terminated Father's parental rights.*

¶20 Father asserts the Department failed to demonstrate it made "active efforts" to prevent the breakup of the Indian family in this case, and therefore the termination of his parental rights was an abuse of discretion. The Department asserts the record demonstrates the Department did make active efforts in this case but those efforts were unsuccessful due to Father's own conduct.

¶21 A court may terminate parental rights when (1) a child has been adjudicated as a YINC; (2) an appropriate treatment plan approved by the court has not been complied with by the parent or has not been successful; and (3) the conduct or condition of the parent rendering the parent unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA. "Under ICWA, evidence beyond a reasonable doubt must support the § 41-3-609(1)(f), MCA, termination criteria." *In re D.L.L.*, 2025 MT 98, ¶ 10, 421 Mont. 522, 568 P.3d 552 (citing *In re K.L.N.*, 2021 MT 56, ¶ 19, 403 Mont. 342, 482 P.3d 650). In determining whether the conduct or condition of the parent is likely to change within a reasonable time, "the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parent[] renders the parent[] unfit, unable, or unwilling to give the child adequate parental care." Section 41-3-609(2), MCA. In making this

13

determination, the court must at least consider the criteria set forth in § 41-3-609(2)(a)-(d), MCA—"(a) emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time; (b) a history of violent behavior by the parent; (c) excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child; and (d) present judicially ordered long-term confinement of the parent."  The court must also make additional findings required by ICWA.  ICWA requires the district court to make a specific finding "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."  25 U.S.C. § 1912(d).  In addition, the district court must determine the continued custody of the child by the parent is "likely to result in serious emotional or physical damage to the child."  25 U.S.C. § 1912(f).  This determination must be supported by evidence beyond a reasonable doubt, including the testimony of a QEW. 25 U.S.C. § 1912(f).

¶22    "ICWA requires proof beyond a reasonable doubt that a state seeking termination of parental rights to an Indian child has made 'active efforts' to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts were unsuccessful." *In re B.Y.*, ¶ 8 (citations omitted).  The district court must document those "active efforts" in detail in the record. *In re B.Y.*, ¶ 9.  "Active efforts" are defined by federal regulations:

14

Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case and may include, for example:

(1) Conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;

(2) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;

(3) Identifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues;

(4) Conducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents;

(5) Offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe;

(6) Taking steps to keep siblings together whenever possible;

(7) Supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child;

(8) Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and

actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources;

(9) Monitoring progress and participation in services;

(10) Considering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available;

(11) Providing post-reunification services and monitoring.

25 C.F.R. 23.2.

¶23 Father argues the Department failed to make "active efforts" in this case by not finding him sooner and by not having a court-ordered treatment plan earlier in the case. The Department's efforts relating to finding Father after removal of the Children in September 2019 are documented in the record. CPS Wallis spoke to Mother, both sets of grandparents, and both the Blackfeet Tribe and the Chippewa Cree Tribe, but was unable to locate Father based on the information she received. Father's counsel was also unable to reach him during this time period. The Department arranged to serve Father by publication. Father ultimately attempted to contact CPS Larson in February 2020, leaving a voicemail with his name and number, but when she tried to call back the number was no good and she was unable to leave a voicemail. Though he was aware of the proceedings, Father did not attempt to contact or reengage with the Department until July 2020, following his release from custody. "[A] district court may protect a child's best interest despite procedural errors that would have no impact upon the result." *In re M.S.*, 2014 MT 265A, ¶ 22, 376 Mont. 394, 336 P.3d 930 (collecting cases). Our review of the record shows the Department engaged in active efforts to locate Father following removal

16

of the Children, but were simply unable to find him. And, in any event, Father's conduct once he learned of the proceeding—leaving a voicemail advising CPS Larson of an incorrect phone number and being reincarcerated—demonstrates that even if the Department was somehow able to locate Father earlier, there would be no impact upon the ultimate result.

¶24 Regarding Father's claim around the delay in ordering his treatment plan, we agree with the Department that even though the plan was not formally ordered until late in the case, Father was provided with his proposed treatment plan nearly five years prior to termination and all parties acted as though the plan had been ordered. At times, the plan was referenced as though it had been ordered by both the parties and the District Court, even when it had not. "While the Department must make 'active' reunification efforts under ICWA, a parent also has 'an obligation to avail [him]self of services arranged or referred by the Department and engage with the Department to successfully complete [his] treatment plan.'" *In re D.L.L.*, ¶ 11 (quoting *In re R.J.F.*, 2019 MT 113, ¶ 38, 395 Mont. 454, 443 P.3d 387). "[A] parent's incarceration may limit the remedial and rehabilitative services that the State can make available to the parent to prevent the breakup of the Indian family. That is not to say that the State's obligation to make 'active efforts' is excused if a parent is incarcerated, but we will not fault the State if its efforts are curtailed by the parent's own criminal behavior." *In re D.S.B.*, 2013 MT 112, ¶ 15, 370 Mont. 37, 300 P.3d 702. The reason Father's treatment plan failed was not because the parties mistakenly failed to realize the court had not formally ordered it in early 2020, but because of Father's own conduct. Father consistently fell into a cycle where he would be

17

incarcerated, released and start to engage with the Department on his (proposed) treatment plan tasks, before disengaging and returning to criminal behavior and reincarceration. The Department's active efforts were also documented in the record and commented on by the Tribes' QEW, who noted CPS Borger had gone "above and beyond" in her attempts to work with Father. The District Court's failure to order Father's treatment plan is not an error which resulted in a significant impact upon the result and therefore does not provide reversible error. *In re P.E.W.*, ¶ 18.

¶25 The Department engaged in active efforts to prevent the breakup of the Indian family in this case, but those efforts failed due to Father's conduct. Father failed to complete his treatment plan and the conduct or condition rendering him unfit to parent was unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA. His continued custody was "likely to result in serious emotional or physical damage" to the Children, as testified to by the Tribes' QEW. 25 U.S.C. § 1912(f). These findings were made beyond a reasonable doubt and the District Court's decision to terminate Father's parental rights was not an abuse of discretion. *See In re P.E.W.*, ¶ 18.

¶26 *2. Whether Father may assert claims on behalf of the Tribes related to a general tribal preference for guardianships over terminations.*

¶27 Father's next contention is that the Department violated ICWA by not deferring to the Tribes' stated preference for guardianships rather than terminations after being informed at Mother's termination hearing. Father contends the District Court erred by disregarding the Tribes' position regarding guardianships and proceeding to terminate his parental rights. The Department contends nothing in ICWA mandates a court elevate a

18

tribal preference for guardianship over statutory criteria for termination and, additionally, that the record does not support Father's claim the District Court ignored tribal preferences.

¶28 "If a child has been in foster care under the physical custody of the state for 15 months of the most recent 22 months, the best interests of the child must be presumed to be served by termination of parental rights." Section 41-3-604(1), MCA. In this case, both Children had been in foster care under the physical custody of the state for the previous 63 months (5 years and 3 months), and there is a statutory presumption termination was in their best interest. "The district court's foremost priority is the best interests of the child." *In re X.M.*, ¶ 21 (citing *In re T.S.*, 2013 MT 274, ¶ 30, 372 Mont. 79, 310 P.3d 538).

¶29 25 U.S.C. § 1914 allows "any parent . . . from whose custody [an Indian] child was removed" to "petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of [25 U.S.C. §§ 1911, 1912, and 1913]." Upon such a showing, "the court must determine whether it is appropriate to invalidate the action." 25 C.F.R. § 23.137(b). "This rule does not require the court to invalidate an action, but requires the court to determine whether it is appropriate to invalidate the action under the standard of review under applicable law." *In re S.B.*, ¶ 28 (internal quotation marks and citation omitted).

¶30 As discussed above, the District Court correctly determined Father failed to complete his treatment plan and the conduct or condition rendering him unfit to parent was unlikely to change within a reasonable time and that his continued custody was likely to result in serious emotional or physical damage to the Children. The statutory criteria to terminate his parental rights were met, he did not overcome the statutory presumption

19

termination was in the best interest of the Children when they had been in foster care for 63 consecutive months prior to termination, and "[i]n a case governed by ICWA, we will uphold the district court's termination of parental rights if a reasonable fact-finder could conclude beyond a reasonable doubt that continued custody by the parent is likely to result in serious emotional or physical damage to the child." *In re K.B.*, 2013 MT 133, ¶ 18, 370 Mont. 254, 301 P.3d 836. In his briefing, Father did not specifically develop which provisions of 25 U.S.C. §§ 1911, 1912, and/or 1913 he asserts were violated by the District Court terminating his rights rather than ordering a guardianship. But regardless of this lack of clarity, under our applicable standard of review whereby we uphold termination of parental rights in ICWA cases "if a reasonable fact-finder could conclude beyond a reasonable doubt that continued custody by the parent is likely to result in serious emotional or physical damage to the child," *In re K.B.*, ¶ 18, it would not be appropriate to invalidate the action as this finding was made beyond a reasonable doubt.

¶31 Prior to a termination of parental rights hearing, the Department is required to meet legal requirements regarding active efforts and placement preferences under MICWA and ICWA. The Department, when seeking the termination of parental rights, is required to meet active efforts that prevent the breakup of an Indian family. Section 41-3-1319, MCA; 25 U.S.C. § 1912(d); 25 C.F.R. 23.2. These active efforts extend to and include all efforts in "identifying, notifying, and inviting representatives of the Indian child's tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues[.]" Section 41-3-1319(4)(a)(iii). Active efforts "must be provided in a manner consistent with

20

the prevailing social and cultural conditions and way of life of the Indian child's tribe and conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and tribe." Section 41-3-1319(4)(a), MCA. In Montana, MICWA has specifically been enacted to ensure "a placement that reflects and honors the unique values of the Indian child's tribal culture and is best able to assist the Indian child in establishing, developing, and maintaining a political, cultural, social, and spiritual relationship with the Indian child's tribe and tribal community." Section 41-3-1302(2), MCA.

¶32 Father's actual claim in this case, that the Tribes' general preference for guardianships rather than terminations was not given sufficient consideration, is not Father's to bring because the termination of his parental rights was appropriate under the standard of review under applicable law. *See In re S.B.*, ¶ 28. In such a situation, the claim belongs to the Children and/or the Tribes and Father lacks standing to assert claims on behalf of them related to permanency placement decisions.

¶33 The Tribes themselves could have intervened to assert the Tribes' interests related to guardianships in this case. 25 U.S.C. § 1912(a). Representatives from both the Blackfeet Tribe and the Chippewa Cree Tribe were present at Mother's termination hearing, when the District Court terminated Mother's parental rights after the Tribes made their preferences for guardianship over termination known. The Department and the Tribes then worked, after being ordered by the District Court, to get approval for a subsidy to fund guardianship if guardianship was ordered by the court. The subsidy was approved by the State, but the Department made clear it did not believe any alternative other than

21

termination was in the Children's best interest even after the subsidy approval. Both Tribes were provided notice of Father's pending termination hearing in the months following Mother's termination. The Chippewa Cree Tribe did not appear at Father's termination hearing at all, while the Blackfeet Tribe representative briefly appeared at the start of the hearing, but left without otherwise participating. The Tribes did not seek to intervene at any point.[5] Because termination of Father's parental rights was supported by the record, claims related to the sufficiency of the Tribes' input into permanency placement decisions could only be brought by the Children or the Tribes, had they intervened in the case. As the Tribes did not intervene and bring this claim themselves and Father lacks standing to raise it because the termination of his parental rights was supported by the record, we do not address it further.

## CONCLUSION

¶34    The District Court did not abuse its discretion when it terminated Father's parental rights as the record demonstrated the Department engaged in "active efforts" as required by ICWA; Father failed to complete his treatment plan and the conduct or condition rendering him unfit to parent was unlikely to change within a reasonable time; and his continued custody of the Children was likely to result in serious emotional or physical damage. In addition, Father's claims regarding tribal preferences for guardianships over

---

[5] Though they received notice of the proceedings, representatives from one or both Tribes appeared at fewer than five of the more than twenty-five hearings during the five-plus year pendency of this case.

terminations belong to the Children and the Tribes themselves because the termination of

Father's parental rights was appropriate.

¶35    Affirmed.

/S/ INGRID GUSTAFSON

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ KATHERINE M. BIDEGARAY
/S/ JIM RICE